Thank you. May it please the Court, I'm Judge Tolman, I'd like to reserve five minutes of my time. I will help you, keep an eye on the clock. Absolutely. Your Honors, the system that Congress incentivized in Section 512 of the Copyright Act for notice and takedown was meant to be a rapid response mechanism for a problem that Congress knew regrettably would happen with the widespread deployment of the Internet. Namely, that there would be a large number of infringing works online and a notice and takedown provision for copyright owners to provide notice for service providers to do something about that. Section 512G incentivizes a counter-notice and put-back procedure. And that procedure is the one that Congress designed to apply to cases like this, to be the cases where if someone believed that their use was privileged under the fair use defense or some other affirmative defense to copyright infringement, they could bring that to the attention and then the copyright owner would have to make a choice. They would have ten days to decide whether or not to institute a suit for infringement and as this Court said in the Shelter Capital case, that would be the mechanism for deciding whether or not there was indeed infringement. The rapid response system that Congress designed simply can't function. If every, if as Ms. Lenz contends in this case, every takedown notice must be preceded by some consideration of fair use. Is that an argument you should be making to Congress? When we look at the statute, it looks like the plain text, a reading of it, says that fair use should or could be and likely needs to be considered. But Your Honor, with respect, I would say no, that's not. The statute, first of all, doesn't say in 512... 107? 107 says that a use that is a fair use based on the full factors is not an infringement of copyright. But the Supreme Court has made it abundantly clear in the Campbell v. Acuff-Rose case, this Court has made it clear in the Monge case, in the Perfect Ten v. Amazon case, fair use is an affirmative defense. It has to be raised... ...as an integral part of the statute. If it were just a judicially created matter, then your point would be far easier to understand. But if the fair use doctrine is an integral part of the language of the statute itself, how can it just be an affirmative defense? Well, that's what the courts have said. And the reason that it's an affirmative defense, Your Honor, is because many of the facts that will be necessary to consider the fair use defense will reside with the secondary user. For example, in this case, the plaintiff has contended that her purpose was non-profit, her purpose was to allow her mother, who lived in California, the plaintiff lives in Pennsylvania, but was to allow her mother to be able to watch a video of her child. There's no way that Universal could... and that her mother had difficulty downloading large email attachments. There's no way that Universal could have known that that was Ms. Lenz's purpose. Do you have any kids? Upon what I do, indeed. So if you look at this video, I struggle with how anybody looking at this from Universal's perspective would doubt that when you have some little children playing and dancing around to music by the artist formerly known as Prince, they could view it as anything other than a fair use. What am I missing? Well, Your Honor, first of all, it's not simply a video in isolation. It's a video that's posted to YouTube, which is a commercial service, and where the artist, and I should make clear for the record that I believe the artist is now known as Prince once again. Oh, well. It's okay. Can we just say Prince? So the case is over, right? Time is limited. But Judge Smith, the point being that Prince, who was the copyright owner in this case, did not want his music synced to videos to YouTube. YouTube is a commercial service. I grant you, counsel, that it is certainly used in that way, but I don't remember seeing in the record here how many videos that are put up on YouTube have any remote commercial use. But I suspect just based on my own observations, they're mainly just things that people put up. They think they're funny or they think they're serious or whatever, and they put them up there. Well, Your Honor, with respect to YouTube in particular, I would say that the record does include a number of documents that were filed in the Viacom v. YouTube case in the Second Circuit. And the court, of course, can take judicial notice of the fact that well over 75% of the material that was on YouTube at the time, and that was just at the time of the suit, was made a use of copyrighted work that were not cat videos, that were not kids dancing around kitchens, that were in fact commercial uses. What we know today, the MPAA and the RIAA, as amici in this case, have said a year and a half ago that every minute, 100 hours of footage or user videos were being uploaded to YouTube. If you look on YouTube's site today, what it will tell you is that in just that year and a half, that's tripled, it's 300 hours of content that's being uploaded every minute. And it's always been the case since the inception of YouTube, and there's no dispute about this, that YouTube has been used by people who have made widespread wholesale use of copyrighted works, be they movies, be they music. It's simply not the case that YouTube, it's simply not the case that many Internet sites are populated with obviously non-infringing fair uses. I appreciate your argument, counsel, but I guess what I'm struggling with is this. Let's say that everything you said is absolutely true, and let's say that a whole bunch of those have some commercial intent. But again, you have someone who puts her children there dancing. How did the person who analyzed it, Mr. Johnson, perhaps I got the wrong name, but who looked at this apparently very quickly, just mainly seeing whether the music was on there, how could you have not concluded that this fit within the four-pronged test of fair use? It's because he didn't consider it, right? What happened was he was an administrative employee who was tasked with dealing with what the record shows were thousands of unauthorized uses. He had no training at all in fair use law. Of Prince's music. What he had been told, Your Honor, was to look to determine whether or not Prince's music was a significant focus of the video. He didn't look at it quickly. The record actually shows that in this case he looked at it twice. What he had been told was that if it was a significant focus of the video, and there are relatively few cases that deal with the question of music or other copyrighted works as what is called, everyone's claimed to be here, as an incidental background. Is it fair to say that for our purposes as the panel in this case, that there was no attempt made to determine whether fair use was being made of Mr. Prince's music? It is fair to say, Your Honor, that there was no consideration of fair use in the way that the plaintiff and the district court defined it. That's interesting to me because you did have somebody look to see if it was the significant focal point of Prince's music. But I'm trying to figure out why did you do that? Because there was one artist at Universal at the time who had indicated consistently that he did not want his music on YouTube. No, I understand that, but you phrased it as significant focal point. You didn't say at all. You didn't say if you see anything regarding Prince at all, take it down. So it seems that from that, that somebody at Universal contemplated that there was an acceptable use of the video. It looks like you checked for compulsory license.  And by asking Mr. Johnson to check for a significant focal point, impliedly that means you were contemplating fair use. There is nothing in the record that says what Prince's performance was. No, I understand, but is that correct? I mean, they didn't just ask him, hey, if you see anything at all, just the title or anything at all, take it down. Why was that? What the record shows is the way Universal believed it had the right to request to take down. Well, it says that, but yet it instructed him not to just take everything down. Correct. If there was a fleeting use of something or if it was deep background, if there was something, the example that he gave at his deposition was that if there was something that was playing on a jukebox, that that would be deep in the background, that then he would not put that on the list because it wasn't believed that that was actually making use of the Prince composition. I do think, I want to make one thing. You have some time issues, and I want to proceed to whether, you know, let's just assume, I know you don't agree and you're arguing strongly that fair use should be considered or part of the equation here, but let's just assume we think based on the language in the statute that it is, then we have to move on to see whether there was good faith or not. Is that correct? Do you agree? I believe, Your Honor, that the question is in terms of if you think that it has to be considered. First of all, I don't see how on this record, given the review that did take place and the fact that it was done twice, how there could be a finding that this was done in bad faith. But what I would also say, Your Honor, and I do want to be mindful of my time, is that we focus quite a bit on what Sean Johnson did and the facts of this particular case. But the rule that Your Honors will announce is not simply a rule that will apply to Ms. Lenz's case. This is something that applies to all copyright owners. And as is said in the amicus brief of the MPAA, over the last two and a half years, just with Google Search, not including YouTube, just Google Search, the MPAA has sent over two and a half million takedown notices. The RIAA sends two million takedown notices to Google Search every month. The statute simply can't function as a rapid response mechanism, Judge Merguia, if there has to be, somebody has to look at something, somebody has to make a decision. And as the Court said in Mons, fair use is simply not a mechanistic exercise. It's not a gestalt judgment. It's not a Potter Stewart, I know it when I see it type exercise. There are multiple factors that have to be considered  And to your point about the language, one also has to look at the language in the context of the structure of the statute as a whole. And where you have a mechanism that Congress has provided, a put-back mechanism that says if somebody believes that they have the affirmative defense of fair use, somebody believes they have the defense of an implied license, somebody believes they have the defense of waiver, of estoppel, of unclean hands,  to a claim of infringement, that's the place where that defense can be raised. And that's what was done in this case. Let me jump in here. I have similar questions. Given that you concede that the phrase authorized by the law under the statute includes compulsory licenses under Section 112, and in looking at the language, it closely mirrors the language of fair use under Section 107, why is fair use not authorized by law? Authorized in the context of the statute, in the context of a rapid response mechanism, in the context of the statute that provides a systematic way for users to raise a defense, to raise numerous defenses, we submit it only makes sense to read authorized by law to require the copyright owner to know beforehand of those defenses that the law has affirmatively authorized, such as in the case of Section 115, which is a compulsory license. And Section 115B of the Copyright Act plainly says that in order to have the compulsory license, one has to give notice of who they are and the license that they are obtaining to the copyright owner. At that point, the copyright owner just is knowing whether they affirmatively or their agent has granted a license, which are the first two components of that section. What confuses me about your answer is, is the distinction in the ease with which one can determine the existence or nonexistence of a compulsory license as opposed to trying to determine whether these facts establish fair use within the meaning of the copyright law? I think the distinction has to be, Your Honor, that in order to have a time-sensitive mechanism, what the copyright owner can reasonably be charged with knowing are those licenses and permissions that either it or the law has affirmatively granted. But what did Mr. Johnson check in order to determine whether a compulsory license might exist here? As I understand it, you can't tell from just looking at the YouTube video who posted it, can you? There is no compulsory license for the synchronization right under copyright. The compulsory license under Section 115 applies to the reproduction right. And you'll see at Excerpt to Record 1471 an example where one of Prince's representatives contacted Universal and said, there's a cover album, this is Prince's music, take it down. And the response was, we can't do that. They have a compulsory license under Section 115 of the Copyright Act not to do it. What it shows is that Universal followed that. There is no compulsory license for the synchronization right, which is why there didn't have to be a check for it in the case of Mr. Johnson watching. I mean, it is much easier to determine whether a compulsory license exists than whether or not it's fair use. Yes, because the copyright, that's something they've got notice of. In the same way, Your Honor, in the same way that if the copyright owner or its agent has granted an affirmative license as opposed to a compulsory license, the copyright owner clearly is charged with knowing that. They at that point know in the language of Section 115 if they represent that there is infringement, they knowingly, materially misrepresent that there is infringement, which is not the case, which would not be the case if there... So your position is that when Congress debated the Act, it essentially balanced the competing interests and it created a mechanism by which fair use could timely be raised through the put-back request. And in fact, first of all, Congress, if you look at the legislative history that exists on this statute, Congress didn't specifically mention the words fair use. What it did say, and this is at page 50 of the Senate report, which I would encourage you to look at, is that the Judiciary Committee in the Senate added what is now called Section 512G. At the time it was in committee, you'll see a reference confusingly that it was 512F. But it said this was the provision that was added because there was concern that there needed to be some recourse for users in case their material was taken down. I'm happy to answer other questions, but since I want to reserve some of my time... I mean, it's an important case, so we'll give you a little extra time. But I guess the... Why, I guess, why does fair use... Why is it different from any other affirmative defense like laches or... Our point is, Your Honor, that with respect to other affirmative defenses where the...think about estoppel, where there's a question as to whether or not the person claiming estoppel has relied on something. There is knowledge that is in the possession of the other person, the person who would be the defendant in an infringement case. But the copyright owner doesn't have, and that that's a reason that one would expect them to make that decision, to make that showing, to show, as the court said in the Shelter Capital case, whether the use is indeed infringing after a full-blown analysis. With respect to fair use, Your Honor, it has aptly been called the most troublesome doctrine in the entirety of copyright. I believe that, as Your Honors know from your own experience in the Elvis Presley case or the Monge case, cases of fair use divide individual courts. They've divided the Supreme Court in cases five to four. They've divided this court and numerous other appellate courts. They come out differently in the district court than they do in the Court of Appeals, than they do in the Supreme Court. Professor Nimmer has said it's the most indeterminate area of the law. And one, in looking at the structure and in looking at what Congress intended, Your Honor, there's a real question as to whether or not it's conceivable that Congress intended that this process, which was designed to deal with a system where you now have literally millions of takedown notices sent a month, contemplated that you would have copyright owners sitting and trying to evaluate a potential defense where they would lack the information to make a complete assessment of the defense and where it's indeterminate and where it's hugely time-consuming and where the statute provides an easy mechanism that if somebody believes their use is a fair use, they can raise it and then that can then be put out. But if, just arguendo, if the fair use doctrine is an integral part of the statute, it sounds like you're asking us to essentially do what the Chief Justice did with the recent Affordable Care Act, which is to discern the intent of Congress from the penumbra and thereby determine that, in effect, this preliminary takedown notice that you send could never have any, if you will, damages that would flow from it because you're not really being asked to make any legal determination, for example, in the fair use area. You can't do it up front. It was all intended to be done on the back end. Is that correct? Yeah. The only thing I would say, Judge Smith, is that I don't think that this is a case of trying to look at the emanations from the penumbras. Those are fine to look at. They are. But I believe that what the Chief Justice said in the King case, and it certainly is our view, and, frankly, it's a longstanding view of statutory construction, is that one can't simply look at the individual word in isolation. Unless you agree with Justice Scalia's approach to textualism. So we're dealing once again with this tension. From your perspective, Congress couldn't have intended what the statute seems on its face to say. Justice Scalia would say, you know, if they blow it, then you've got to go back to Congress and take care of it that way. Isn't that really what we're dealing with here? Well, there's a question, Your Honor, as to if the statute is, the words in isolation are ambiguous. And I would submit, Your Honor, that there's a difference between authorized by law and being excused or somebody having a legal defense that would make something that, as this Court said in the Monge case, a use that otherwise is infringing is excused as a fair use. You know I disagreed with that. I understand that, Your Honor, but that just goes to my point that fair use is a particularly difficult doctrine. And so where the language of the statute, I would submit, does not clearly answer the question just in C-3-5, one has to look at the entirety of the statute that Congress created to determine what it was trying to do and how this defense fits in. Before you sit down, because I do want to hear from Ms. Lenton on these interesting questions, I didn't see any numbers in any of the records that I looked at to tell me how many put-back requests there are in response to the 2.5 million takedown notices that the MPAA has filed. What they have said is that they didn't put anything in their brief. They have said that there are a relatively de minimis number of put-back notices that come in. What does relatively de minimis mean in the face of 2.5 million takedowns? Well, let me give you some examples. One of the things that the plaintiff in this case cites is an article purportedly to show that there is an epidemic of takedown abuse and that particularly there's an epidemic of takedown abuse at the time of elections. That's one of the stalking horses that we've had in this case from the beginning is that we're not so concerned with the individual with kids running around in their kitchen, we're actually concerned with the fact that somebody will swing an election four days before. And I looked at that and cited it in one of the footnotes in the plaintiff's work. And what that actually shows is that after an exhaustive search to try to find every takedown notice and put-back contested during an election, they found 12 examples, 12. And now that's with one particular category. All of them, mind you, were not, none of them was a case of what is claimed to be the thing that we need to be afraid of, which is the opponent, which is, for example, in the McCain case, the Obama campaign sending a takedown notice. That wasn't what it was. What it was was it was actually the copyright owner. But the other response that I would have for you, Judge Tolman, is that we do have an amicus brief from automatic Google Tumblr who have said they've not been precise in their numbers. What they've said, which I think is very telling, is that most of the takedown notices that they receive from copyright owners are sent in good faith and they comply with them. What they say is that they have, and I believe the numbers that they used were a couple of hundred, sometimes from serial repeaters, and people who are truly abusive of the takedown process, people who by the description in the amicus brief, and that's all we have to go on with that is the description in the amicus brief, but are instances where people who are not the copyright owner, not authorized to act on behalf of the copyright owner, pretend to be the copyright owner and send something. I have just one quick question before you sit down. So do you concede that this was fair use? No. So you don't concede that this was fair use, but even if you did concede it was fair use, it would have to be dealt with in an affirmative defense and not be interpreted as not infringement of copyright based on 107. If the affirmative defense is proved, then Section 107 is clear. If something is adjudged to be a fair use, it is not an infringement of copyright. Had there been a prior determination as to fair use, had there been a knowing misrepresentation that this was infringement, that would be one thing. But Universal never filed an action against Lynn. To be clear, Judge Tallman, Universal was sued by Ms. Lynn very quickly. Universal had 10 days after she filed her putback request, and it did not file an infringement action against her. Which is evidence, Judge Tallman, that the notice and take down and putback procedure worked exactly as it was intended. So even though you're not conceding it's fair use, we can draw, I guess, whatever inference we can draw from the fact that no action was taken. You just said you don't concede that this was fair use. No, Your Honor. And if this was litigated, what I will say is if this was litigated, this would be a challenging case, I believe, for both sides as to whether the fair use defense applied. There has never been, and the reason I say that, Judge McGeough, is that there's never been a case as the EFF said when Ms. Lynn contacted them and described her case to them. They said this is an area of the law that's unclear. We'd like to, this is relevant to our mission, but the courts haven't ruled, as they haven't, on whether or not something is a fair use when it is the background in music. And the cases that we've cited, the case of the Ringgold case from the Second Circuit, the Higgins case from Michigan, the Jackson v. Warner Brothers case, this is the constellation of cases such as they are that deal with whether or not something that is a copyrighted work that appears as the background to another work is a fair use. And what those cases say is that the test for determining whether or not there has been transformation is whether or not it turns on whether the work that's being used, the underlying copyrighted work, is the focus of the video. And here what you have, Your Honor, you have a YouTube posting that wasn't titled My Kid's Running Around the Kitchen. It was titled Let's Go Crazy Number One. You had the music playing not just a random few notes, but playing throughout the posting. You have the videographer saying, What do you think of the music? It's plainly the nature of a, it's on a commercial service, therefore the use is commercial. This isn't just, and in the context of the notice and takedown statute, it's not just a matter of Ms. Lenz's liability, it's also a matter of YouTube's liability. That's why they adopt a notice and takedown and putback procedure is so that they themselves will not be liable when there's an artist who doesn't want their music to be synchronized with videos. So what I would say is do I concede that there would be a challenge? Do I concede that it would be a challenging case of fair use and that there would be arguments on both sides? Absolutely. And that's one of the things that the statute and the putback procedure gives the copyright owner the right to determine in deciding whether or not to proceed with an infringement action. Okay, Mr. Kost, I'm giving you the hook. Thank you, Judge Hellman. All right, but we want you to contemplate the eternal question, did Elvis leave the building? All right, we'll now hear from Ms. McSherry. Good morning, Your Honors. May it please the Court, Kareem McSherry on behalf of Stephanie Lenz, who is actually here in court with us today. Mr. Krauss just gave us quite an elegant fair use analysis and a much more complicated one than I think Sean Johnson needed to perform, but I want to be very clear as a baseline that what happened in this case is that Universal never formed a good faith belief or any belief as to fair use at all. So that's important. Let's talk about what Mr. Johnson would have done under your proposal. Would it have been sufficient if Mr. Johnson had testified, well, I thought about fair use, but gosh, the song played for 23 seconds. It was clearly discernible as a Prince song. The title of the video mimicked the title of the song. I didn't think that was fair use. Is that sufficient under your view of the law? If he testified to that, would we be here? I don't think that would be sufficient, but I just want to be clear that he didn't do any of that because no one ever instructed him to do that. But you're asking us to essentially clarify an area of the law and tell all of these copyright owners what they have to do before they can file a takedown notice. Absolutely. And I want your help in how we write that opinion if we rule in your favor. I understand. And I'd like to respond to that by speaking to the second point that I think we've all been talking about this morning, which is what does the statute require? Because I think that what you need to do is you need to come at a minimum to some conclusion about what is authorized by law and whether the use is authorized by law. And the statute is not ambiguous about this. If you look at Section 5, Code C, it says you have to make a statement that the use in the manner complained of, which suggests looking at context, is or is not authorized by law. And we don't have to guess why Congress put that language in because actually we have legislative history that tells us what Congress had in mind. Of course Congress was worried about copyright owners, but Congress was also trying to craft a balance between the needs of copyright owners, the needs of service providers, and the users. So why didn't they strike that balance with the takedown and put-back mechanism that they ordered in the statute? In essence, you are asking us to reignite the congressional debate over how you accommodate the competing use of the poster of the alleged infringing material and the rights of the copyright owner who is alleging that its rights have been infringed. And Congress did that, did it not? I respectfully disagree, Your Honor. I don't think you need to reignite any debate. I think all you need to do is look at what Congress said it was doing in Section 512F where it said the purpose of Section 512F is to deter improper takedowns, and if you look at the legislative history where we know that Congress said we're worried about improper takedowns, so we're going to craft a balance. And the way that they did that is a combination of things. Certainly 512G, a very important piece of that, but also by putting specific language in 512C for how you state infringement. So you can't just send a notice saying this is infringing. There's a particular way that you have to assert it. But why can't we draw the inference from the fact that there are millions, literally millions, of takedown notices that are filed and virtually no or de minimis put-back requests? Doesn't that suggest that copyright infringement is rampant all over the Internet and that what you are asking for here is a clarification or an interpretation of the law that will make it more onerous on the copyright owners to get these takedowns accomplished against people who are truly infringing their copyright? Okay, so I think I heard two separate questions there. One is why isn't Section 512G enough, given that there are hardly any counter notices? Why isn't that enough? And I think that we actually can't infer from the relatively small number of counter notices that there aren't improper takedowns. And recall that even if a very small percentage of DMCA takedowns are improper, given the millions of notices that are sent, that's still a lot of lawful speech that's being improperly taken down. It's also true that for the layperson, and this is based on my experience with counseling people, for the layperson the counter notice procedure can be quite intimidating. And I would point out, just by the way, in this very case, Ms. Lenz tried to use the counter notice procedure, and she got back very harsh notice saying that that was not sufficient, your use is not licensed, no consideration of fair use. Your use is not licensed, it's illegal, go home. So that's a very intimidating situation for a regular person. What do we do, though, with the point that the opposing counsel made that in this case, given the length of the play, the name of the video, et cetera, that it is an, in quotes, close question as a matter of law when you apply fair use analysis. Given that fact, what should Universal have done in this case in response to your clients putting the video on YouTube? I think that they should have left it up, Your Honor. But understand, they have a copyright holder that says, you know, I don't want anything that's, so it's a long, I don't want it, it's taking money from me, I'm entitled to this under the law. So they look at this, and they have a fairly neat legal question. Are they required under your analysis to have a copyright specialist, a trained lawyer analyze each of these and make a, if you will, a legal opinion, arrive at a legal opinion with respect to each? Is that what's required under the law? So I think what Universal was required to do here was at the very minimum come to some legal conclusion, which it did not do. In the sense of not considering fair use. Didn't consider fair use or any of the other statutory sections that apply. Let's just say they had an expert who was looking at this. What would you believe would be required here in order to satisfy the statute? So what I think a copyright owner needs to do is make a legal determination based on the facts presented. You don't need to do factual investigation, any pursuit, but just based on what they saw, what that reviewer saw, come to some conclusion, an objectively reasonable one ideally, but some conclusion at least. So in effect you're saying that they should do a 12B6 analysis of the plea. Well, let's talk about burden, because I understand that the panel is concerned about that. And the thing that I would actually point you back to the amicus brief filed by the MPAA that Mr. Klaus just cited. What do we know from that brief? The MPAA says we take down millions of blatant infringements and we give a wide berth to transformative uses. So what do we know? We know that the MPAA already has a process for taking down infringing activity and also, based on what it says, giving a wide berth to transformative uses. So I think it is not so very impossible. It's also true that there are, this is outside of the record, but let's just say, there are tools that exist now to do things like identifying users that are likely or not likely to be infringing, identifying those and screening. Are you talking about computer analytical tools? For example, you can use hashes to identify exact audiovisual matches, for example. So you could tell a reviewer, you could design a policy, attorneys should consult with this, but they could design a policy that said, okay, if it's an exact audiovisual match and there's no commentary, there's none of these identifiers, that's likely to be not a fair use. So then that gets back to my 12B6 analysis. You're saying that the, in this case, YouTube was required to look at the elements, if you will, to satisfy the statute. And if they don't do that, then they're not in compliance. If they do that and, in effect, form a preliminary legal opinion as to whether or not a cause of action is stated, then they go forward. Is that correct? I think that's right. But what I'm also suggesting is there are tools that are available now so you could screen out so you wouldn't have to have an attorney look at every single one. That's right. A machine is going to make the determination? No, no. A machine can be used to screen out the uses that are far more likely to be infringing or are virtually certain to be infringing. And then I think you might, as a copyright owner, you have to make a risk decision. And you are in the best position to make that risk decision. So you might say, I want to come up with an efficient tool that complies with what Congress required me to do. Right, coming back to the statute. And in order to do that, I'm going to use tools and review practices that are going to screen out the likely infringing uses and the likely non-infringing uses. What you can't do is just ignore it altogether. But let's go back to Judge Smith's hypothetical, which I think dovetails with the one I posed to you. Suppose that MPAA creates the Office of Fair Use Wizard. And the Fair Use Wizard is an expert based on legal training and technical background. And Mr. Johnson comes to him with this particular video with the factors that we've discussed here. And the wizard says, I don't think that's fair use. Would that be sufficient under your view of the statute for Universal to go forward in good faith with a takedown notice? Well, I would say, first of all, it's more than Universal did, just to be clear. But understand the hypothetical. I know what Universal did or did not do. I don't think that would be sufficient. That would not be sufficient. Correct. So maybe we need a tribunal within MPAA consisting of three experienced people in computer technology and fair use. And they're going to have to opine on the facts before. Would that be sufficient? Your Honor, I don't think that we need to get that far. The decision just has to be objectively reasonable. In this case, I think a decision that the use was not fair would be objectively unreasonable. What would be wrong if Mr. Johnson made the decision as long as somebody later determined that was an objectively reasonable decision? Well, if he had come to a legal conclusion at all and it turned out that it was objectively reasonable, then you don't have 512F liability. How do we write the opinion? You're not helping me in terms of telling the copyright owner what it must do in order to bring itself within the protection of the statute and avoid this kind of litigation. I think what we need to tell copyright owners and what I think Congress told copyright owners is that you have to consider fair use as well as the other statutory exceptions that are explicitly blessed by the Copyright Act before you send a takedown notice. And your determination has to be objectively reasonable. Get back to what both of us are saying, though. You're saying that the statute requires the copyright holder and its agents to undertake a legal analysis, and in the terminology and the example I used, to, as a judge, if you will, say, you know, you state a cause of action. All the elements are there. Therefore, we believe that it's okay or it's not okay. A layperson, as it were, could not perform the function that you described. Or someone's not trained in fair use, et cetera, et cetera. I would agree with the latter. I do think that there needs to be someone in the review process who's able to advise the reviewers for what to look for so they can identify fair uses when they see them. And I don't agree that this is all so very burdensome. The vast majority of uses are going to be infringing. You have to be able to come up with a mechanism that you agree would be sufficient under the statute. That's the concern I have. What am I going to tell the copyright owners of the world that they have to do? Well, I think what you can tell the copyright owners of the world is that they have to build into their review process some way of considering fair use. And depending on what their objective is. Do they have to get a legal opinion from in-house counsel as to whether or not this constitutes fair use? We could demand an opinion letter, just like in a securities offering or a due diligence. A lot of lawyers need employment, you know. Right. I do not think that that's what Congress intended. I think that what Congress intended is that the copyright owner build in some process for considering and identifying fair uses. What Universal's arguing for here is to basically get a pass on that and get permission to take down local uses. The focus has been, by Mr. Klaus, on the fact that it's affirmative defense. What's your response to that? Well, compulsory license is an affirmative defense as well, Your Honor. I mean, any number of statutory exceptions, any number of provisions by which the Copyright Act exclusively blesses certain uses may be raised procedurally as an affirmative defense. But we also know, the Supreme Court has said several times, as has this Court, that a fair use is not an infringing use of copyright. If you look at Section 106, the bundle of rights that are granted in Section 106 are explicitly cabined by the following sections, and the very first one is Section 107. And so you're saying that some sort of screening has to be done, probably more than what occurred here. What occurred here? Was Mr. Johnson looking for what, in your view? So I think we know from the record what occurred here, and it's very clear. And Judge Fogel actually found this. So Mr. Johnson was never trained in fair use. Mr. Allen, his supervisor, the attorney supervised him, didn't think he needed to be. What happened is Mr. Allen was sent forth to identify videos where a print song is the focus of the composition, meaning it's not just playing in the background and it's there for more than one second. If the video met that criteria, he put it on the list for takedown. That was sent to an attorney who did not review any of the videos. She sent that list on to YouTube with the intent all around that all of those videos would be taken down, and that's exactly what happened. But then a putback request was filed, and YouTube put it back up, and I guess it's still there. I haven't looked for it, although I have viewed it from the record. So why doesn't that adequately address the concern that brings us here today? Congress did provide for a mechanism. It's just not as fast as you prefer. You would have preferred that no takedown notice ever issued at all. Well, I do think that would have been the right outcome, given that they couldn't form a good faith belief to the contrary. But putback isn't important. So there's no way that Universal could have determined on these facts in good faith that there was a potential infringing use here? I don't believe so, Your Honor. Okay. All right. But to answer your question, because I understand this is an important one, why isn't putback sufficient? And the reason that putback isn't sufficient is what that means is Congress created, in order to accept that, we have to agree that Congress created a two-week takedown for lawful speech and a provision by which there can be a two-week takedown of lawful speech without any judicial review. I mean, we realize this is a private system, but everyone knows that as a practical matter, a service provider is heavily incentivized to take down any content that is the subject of a DMCA notice. But you're not going to be able to get a judicial determination in ten days when there are millions of these notices that are being issued as to whether or not this is fair use. Correct. So how does the copyright owner make that determination in order to bring itself within what I'll call the safe harbor of the statute? Well, all the copyright owner needs to do is to come to some legal conclusion about it, decide whether it's a fair use or not, one way or another, and let that determination be objectively reasonable, which means— It has to be subjectively good faith and, after the fact, objectively reasonable or they're liable under 512-F. Well, I think it needs to have a reasonable basis. Is that your position? Yes. It's both subjectively and objectively reasonable. That's correct. And where do I find that in the statute? Well, I think there we need to infer a little bit. So Congress said authorized by law. How do you decide if something's authorized by law? Well, presumably you need to know at least a little bit about what the law is. And I don't think Congress intended to create a world of basically perverse incentives because if we don't have an objective test for the legal conclusion, what that means is that's going to encourage content owners to know as little as possible about that law, about the law. But on the other hand, considering the statute the way you do, it's really a gotcha regime because no matter what the copyright holder or its agent determines, if you disagree with that analysis, assuming that there is some, we're right back where we started from. And then you have to put back in the tension that goes back and forth here. I realize the record in this case is a little different, but if, as we talked about before, if Mr. Johnson had had some training, understood a little bit, looked at this and said, you know, it's a close call. Well, I think it needs to go down. It seems to me it's not fair use. You'd have said the same thing, wouldn't you? You're just wrong, Mr. Johnson. You got it wrong. You shouldn't have approved this. Thank you for the opportunity to clarify because that's actually not what we're arguing. If it's a close call, I do not think it's going to be subject to 512F. You just told me it has to be both subjectively and objectively reasonable. And your position throughout the argument has been that on this basis, Mr. Johnson could not in good faith say that this was an infringing use because it was fair use. So I think that if the use is determined by a court in a 512F action later on to have been a close call, then it's not subject to 512F liability. What I'm saying is I don't think in this case a court could determine that this was a close call based on the facts that were presented to Universal. So you don't think, despite the fact that the three of us are really struggling with whether or not this is or is not fair use, that this is not a close call? I don't think it's a close call, Your Honor. There were no advertisements on the video, no sense of market harm. No one in the world would listen to this video rather than listening to the original song. Apparently a million people have listened to it, right? Well, a million people have gone. Now that it's become a cause. Exactly. Before this lawsuit was filed, there were 273 views, and I'm pretty sure they were all from Ms. Lenz's mom. But do you have a number, I guess, is there a statistic, part of the record, of maybe people who would have requested putbacks but didn't because it was too difficult? We don't have those statistics. I think they're very hard to find. I think this is one of those unknowables. I have anecdotal experience of people reaching out to me and needing help with the process, as Ms. Lenz did, but we don't have statistics. We do have statistics from Amici, if we're going to go to Amici again, from Automatic and Twitter and Google, where they talk about the number of improper takedowns that they get. So we know that there are some. What we don't know is how many people decide to push back or why people choose not to push back. But we're really not a forum that can determine that, are we? We can't really hold hearings to determine that way the policy balances. We're stuck with the statute, right? I think you are stuck with the statute, but I also think the statute is really quite clear on the point that we're discussing here today, and I understand that perhaps the content owners are concerned about this. But if so, I do think that that's an issue to take up with Congress and not with this Court. I think there was an argument made in the briefing by Universal that if it's failure to consider fair use is enough to establish the 512F liability here, then Universal would also be liable, I guess, for violating 512F with respect to each of the other 200 videos that were part of the takedown notice. Is that correct? Actually, on that issue, I would take you back to this Court's decision in Perfect 10 v. C.C. Bill, where along the way it was said if there's an improper takedown, if there's a takedown and the material is infringing, then justice has been done. If it's not infringing, if it's lawful speech, then you have an injury. So I think there's a distinction between a takedown of unlawful speech and a takedown of lawful speech. There's been a lot of discussion about the statute, but I'd like to just know your position exactly with respect to Rossi and whether or not it's controlling for us here. So, I mean, obviously Rossi is the law of the circuit. Our position is Rossi most certainly never reached the issue here, the factual situation here of a failure to form any good faith belief at all. But in addition, as laid out in more detail in our briefing, we believe that what was at issue in Rossi was a very specific question, which was whether this MPAA reviewer who had been essentially tricked into concluding, based on ample evidence on this website, that the website led to infringement, whether that reviewer needed to do a further factual investigation. And this Court quite rightly said no. But I believe that if this Court had been presented, confronted with the question of what's the standard for the legal conclusion, it would have come out very differently on that standard and would have required an objective good faith standard. Well, would you concede that Rossi at least binds us with regard to the subjective objective question that we were discussing? I believe that Rossi binds you with respect to the factual investigation, but there was no question. If you look at the opinion, it's very clear that the Court was not concerned with whether the legal conclusion was held in good faith or not. Let's just say maybe we don't disagree with you. We disagree with you on that. Doesn't Rossi clearly tell us we have to look at good faith? You certainly have to look at good faith, but the question that is presented in this case is very, very different from the question that was presented in the Rossi case. There was the good faith standard for the factual investigation. This presents something different. And again, I would say if the standard for the legal conclusion is purely subjective, it seems like Rossi requires you to demonstrate some actual knowledge of misrepresentation on the part of Universal. Do you agree with that? Yes or no? I would say that Rossi requires that we present evidence of objective good faith with respect to the legal conclusion, but I would say one more thing. Let's just say we disagree with you and it says that you have to demonstrate that misrepresentation. Could you do that in this case? Absolutely. How? Because what we know is that Universal had a policy of not considering whether the use in question was authorized by law. That was knowing it was an active policy designed by Universal and enacted by its reviewer. They made an attestation, they made a misrepresentation that they had considered whether the use was authorized by law. They knew that that was wrong. It wasn't an inadvertent failure. It was a knowing choice. I want to just switch as my colleague indicates it's an important case. I want to ask you about damages. Okay. There are, except for the attorney fees, really de minimis damages here. The American rule about attorney fees is you don't get them unless the statute expressly provides for them. What's your view about whether attorney fees should or should not be considered as damages and whichever way you go, on what do you rely? I rely on the statute. The statute says any damages. It's very clear, any damages including attorney's fees and costs. And we know from U.S. v. James that when you have the phrase any, any damages, you take it, Congress, at its word. You take that as a broad construction. And so I think Congress was very clear about how it understood damages. But the problem that you have factually is that Ms. Lenz is not contractually obligated to pay you anything for fees or costs. So two things. One is Ms. Lenz has pled nominal damages, and I think nominal damages are quite appropriate here. With respect to fees and costs as part of the damages, we do have a retainer agreement in which it's understood that if there is a recovery of fees and costs, it comes to her pro bono counsel. As many pro bono counsel do, this is how we do our work. But how do you get around this question about the American rule? If she doesn't incur those costs in the first place, there's no obligation to pay them if you lose, then how is she damaged by having to pay attorney fees? I understand that you would like to be compensated for your time, although you're doing this on a pro bono basis. So there is the American rule, but we also have a statute that takes a departure from that American rule in Section 512. Yeah, not yours, not yours. What my colleague and I are both getting to here is if she has to pay them, then sure, the statute covers her, because she then would be out of pocket for your fees. But where she has no obligation to pay you anything, you're doing this out of the goodness of your heart and doing a fine job, how does the statute cover your fees since she is not personally obligated to pay anything? So there I think we need to look at some of the cases that have raised similar issues about pro bono fees and whether they will be compensated or not, and looking particularly to how, for example, in Cuellar v. Joyce, courts have interpreted the notion of incurred. And what courts have said, sort of consistent with good public policy, is that even if the client was not going to be under an obligation to pay those attorney fees and costs, if they were incurred on her behalf, then they were incurred. And that is exactly what we have here. But those aren't her damages. That's my concern. Well, I think that's where we have to look at the interplay of those fee-shifting statutes and the admittedly unusual damages provision that we have here. I mean, you don't always see that fees and costs are part of damages, but I think Congress did that for a reason, because Congress knew that in this kind of takedown in particular, people aren't going to be able to vindicate their rights if in addition to having their noncommercial speech taken down, they have to go and hire lawyers to hold the copyright owners accountable. So it created another process. Policy-wise, I get your point, but would you agree that the statute doesn't say that expressly? Well, what the statute says is damages including fees and costs, and I think we can read that literally. And then we do have to go outside the statute to understand what incurred means and those sorts of things. And I understand that, but I think the court should start with what Congress says and also looking at the legislative history, understanding what Congress is trying to accomplish. So is your position that this is no different from a civil rights action where a prevailing plaintiff who may be represented on a contingent fee basis is entitled to recover attorney's fees even if the damages are only nominal? I would say it's not identical, but all of the policy considerations that inform those civil rights actions and the way that damages are handled there do apply here because we're talking about the takedown of speech. Well, and in the civil rights case, we're talking about a violation of constitutional rights under colorist state law. Right, but I think that what happened here is Congress set up a system whereby private individuals could cause the takedown of speech. Much of it, most of it unlawful, but some of it unlawful. And so Congress had to build in some safeguards there as part of that private system. Okay, anything further? Thank you very much. Thank you. I was pretty generous with you on direct. I'll give you two minutes and a rebuttal. Thank you, Your Honor. Just a couple of points. One is I think that counsel never really answered the question of what is it that copyright owners are supposed to do. And with respect to one of the things that Ms. McSherry said was, well, copyright owners can take solace in the fact that they've got tools, automated tools that can identify things that are very likely to be infringing. But the rule that the plaintiff is asking for in this case is a per se rule of liability. If someone doesn't then take the results of those millions of things that are fed through the computer, some human, and come to some legal determination, what it is we don't exactly know, whether it's a lawyer, whether it's a committee, what it is, but some legal determination that has to be made to check off presumably not just fair use but any other defense that the law might create that under the plaintiff's view would be authorization. If that's not done, it is per se liability. Let me ask you this. Let's assume for a moment that at the time that the takedown notice was going to be given in this case, Universal knew then what it knows now. What, if anything, would you have done in instructing Mr. Johnson, or would you have had somebody other than Mr. Johnson make the determination, and what would you have told him or her about what he or she was supposed to do? Is it difficult to sort of reconstruct that world? Do you understand what I'm trying to understand? I want to understand what, knowing then what you know now, what would you do to address the requirements of the statute? The question is if Universal knew that it was going to be sued in this particular case, it might have come to a very different determination about what it would have done in terms of whether it would have been willing to roll the dice on that. But with respect to the thousands that took place eight years ago in this case— I want to focus on this one. Yes. Would you have kept Mr. Johnson there? In terms of— Just because knowing then what you know now, you're going to get sued and everything. Would you have kept Mr. Johnson there? That I just don't know the answer to that yet. If so, what would you have told him about what he should look for? Well, that depends upon the standard, and that's where I was going with respect to— Knowing then what you know now, what would you have told him? First of all, I don't know. It depends on what the legal standard would be. That's what we're trying to get some help on here. I understand that, Your Honor. But with respect, Judge Smith, the problem is it's not Mr. Johnson just looking at this one posting. It is Mr. Johnson looking at a slew. At the time in question, back in 2007, which is the relative— Take that into account. What instruction? Let's just say we disagree with you. You have to set up a system. What would you have Mr. Johnson—would you have Mr. Johnson do? It all depends on what you mean by— With respect, Judge Merkitt, it depends on what you mean by considering fair use. What I would say to you is that if considering fair use means— There's no reason—with respect to Rossi, there's absolutely— It makes no sense to say that you would say that a factual determination, you're going to judge after the fact based on subjective belief. But you're going to impose an objective requirement to guess wrong. But if what the test is, Judge Merguia, is that someone has to look at a posting and to make a legal determination as to whether there's a fair use, and if they don't— Do you agree with that? I don't agree with that. You don't agree with that. I don't agree with that. But if that's what the court says the rule is, then I think a copyright owner is going to have a serious problem in terms of— Well, what's a good faith, fair use effort? Right. Well, what is it? The answer— Let's just say Congress did that or we did that. What would you do? I'm not sure anything would have to be done differently for the following reason, Judge Merguia, and that is that the policy that was done was not a policy that said don't take into account fair use. It was a policy that said, number one, we're dealing with things on YouTube, which is commercial. That's one of the elements. We're dealing with things that are a significant focus, not transformational. That's another element on incidental notice. I think this is derivative. I'm sorry? This was a derivative. I don't know if this— It certainly would meet the definition of a derivative work under the copyright law. That I think there's no doubt about it. The question ultimately would be whether it was a fair use. And what I'm saying, Judge Merguia, is that if one had to go through the four elements, what I would say is whether or not Sean Johnson was an expert in fair use, it's not clear to me what he would be told that would be different— It's a good faith effort at determining fair use. I'd be curious, but it sounds like that would be impossible for you to tell me. That's what you want to leave it at? That's fine. I don't want to leave you with that impression, Judge Merguia. What I would say is that it is good faith for a copyright owner to set up a system that takes account of all the factors that would be considered if a fair use defense was raised. And I would submit to you that in good faith, that's what Universal did in this case. It created a system. Whether or not it called it a fair use analysis, whether it called it a fair use consideration, it set up a system in good faith. Going to your point about Mr. Johnson looking at the posting twice— Well, you set up the system in good faith, it appears, but you acknowledge now that you didn't consider fair use. I'm just adding something to it. What if you had to set up a system where you had to consider fair use in good faith, what would that look like? If you had to set up a system where you had to do that and you were dealing in a world with overwhelming numbers of infringements, I think what I would say is if you had a high degree of confidence, which is what Ms. McSherry said, that the uses that you were capturing through a screening system were infringing and you put the relative handful of things that present close calls, if you did that, I would think that would be a good faith system. It's not much more than the system you have now, so if it's not much more than the system you have now, then it's not that burdensome. It all depends on what you mean by the system. I'm just following your argument. If you're talking about the system that existed, but just to be clear, what the plaintiff is saying is that's not sufficient. Well, I know what they're saying. I'm curious about what you're saying. We're going to have to make up the difference here, but I'm just curious because you just made an argument right now that it wouldn't be that much different, so right now it seems like you're able to manage. Well, just to be clear. That's the impression you're leaving me with. Again, let me take one more run at it. The system that Universal had with Prince, which was to have an individual sit down and look at the posting, that is a system that can work where what you're dealing with is one artist, several thousand post-its. It's still a matter of time and inconvenience. In a world of millions of takedown notices a month, I would submit that type of system is practically impossible. And if what you're saying is that you as the copyright owner would have a choice, would you take per se liability, which is what the plaintiff is asking for, or would you take a system where even though something is automated, that virtually all of the things, the overwhelming number of things that spit out are highly likely to be infringing and there is no human review, that would still, I would submit, be a good faith. That would be good faith on the part of the copyright owner to set something like that up. And then if they had something for the de minimis number of uses that presented closed calls, that would be preferable to one in which all one million or two million of those were per se liable. Has Universal changed its system of review since this case was filed? Yes. In what way? Well, first of all, I think Universal now, first of all, Prince left. Forget Prince. Well, you're saying Prince left the building, we don't know about Elvis, but my question is in what way, in what way has it changed? Well, it's not just Universal. I don't want to talk about Universal. I don't care about anybody else. It's something that applies to everybody else, which is YouTube now has, and there's nothing, the record is silent on this, but YouTube, this is discussed in various public places, but YouTube has a takedown tool. Google has a takedown tool. A number of other service providers have takedown tools. They are notices that are automatically sent, that are automatically generated and automatically processed. Based on algorithms or something like that? It's based on fingerprinting technology and the like, which can detect certain things. You're taking the human element out of it. Oh, I don't think, here's what I would say. I don't think the entire human element is gone. Somebody has to, first of all, come up with the decision, but in terms of dealing with the mass number of cases, then in terms of the mass number of cases, those are automated, frankly, on both sides. They're automated both on. Does the system have built into the app or whatever it is any legal analysis? That I don't. I think that the legal analysis, and again, this is not the record. I'm venturing somewhat into the realm of things that I don't have hard evidence to give you on. What I would say is that a system that is designed as the type that Ms. McSherry hypothesized that can, with algorithms, locate sort of a match of 80%, 90%, something like that, I think that what is built into that is some determination that a use that makes that significant a use of a copyrighted work is overwhelmingly likely to be infringing and ought not to be. If somebody then comes back and says, well, no, I put two minutes of commentary at the outset. I was going to use this for educational purposes, that that ought not to be subject to 512. Does a human review what the algorithmic program spits out? I don't know the answer to that question. Thank you very much. Thank you, Your Honors. Excellent argument on both sides. We will puzzle our way through and do our best to give you a coherent answer. I don't know how long that will take, but thank you. The case that's argued is submitted, and we will next hear argument in the case of United States versus. I should note that we leave bereft because we came in thinking that Elvis had left the building. Now we hear Prince has left as well. Thank you.
judges: Tallman, Smith, Murguia